IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:11CV297-FDW
(3:06CR430-FDW-1)

JOSEPH DIBRUNO, JR.,                    )
                                        )
                    Petitioner,         )
                                        )
        vs.                             )          **O R D E R**
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                    Respondent.         )
_____)

        **THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or

Correct Sentence pursuant to 28 U.S.C. § 2255, (Doc. No. 1), and on the Government's Motion

for Summary Judgment, (Doc. No. 10).


I.      **BACKGROUND**

        On May 2, 2007, a federal grand jury sitting in the Western District of North Carolina

returned a 37-count superseding indictment charging Petitioner Joseph DiBruno, Jr., Petitioner's

father Joseph DiBruno, Sr., and Petitioner's brother Nicholas DiBruno with conspiracy to

commit securities, mail, and wire fraud, and conspiracy to commit money laundering, and

charging Petitioner with numerous substantive counts of securities fraud, wire fraud, mail fraud,

promotion money laundering, money laundering, concealment of assets from a bankruptcy

petition, and conspiracy to make a false oath or claim in a bankruptcy proceeding.  (Crim. Case

No. 3:06cr430-FDW, Doc. No. 34: Superseding Indictment).  On September 17, 2007, the day

the trial was scheduled to begin, Petitioner pled guilty pursuant to a written plea agreement to

conspiracy to commit securities, wire, and mail fraud, conspiracy to commit money laundering, and concealment of assets from his bankruptcy petition. (Id., Entry Dated Sept. 17, 2007: Plea; Doc. No. 89: Plea Agreement). DiBruno, Sr., and Nicholas DiBruno pled guilty to the fraud conspiracy on the same day. Petitioner and DiBruno, Sr., both filed motions to withdraw their guilty pleas several months later. (Id., Doc. Nos. 102; 128: Motions to Withdraw Guilty Plea). At the consolidated hearing on these motions, Petitioner claimed that he was not aware his attorney was going to file the motion to withdraw his guilty plea, but Petitioner advised the Court that he nevertheless wanted to proceed with the motion to withdraw. On the second day of the hearing, Petitioner withdrew his motion to withdraw his guilty plea and insisted, instead, that he was guilty and wanted to plead guilty. (Id., Doc. No. 162 at 139-50: Hrg. Tr.). On September 23, 2008, this Court sentenced Petitioner to 262 months of imprisonment and three years of supervised release.

Petitioner appealed, and, on March 19, 2010, the Fourth Circuit Court of Appeals affirmed his conviction and his sentence. See United States v. DiBruno, 370 Fed. Appx. 389 (4th Cir. 2010) (unpublished). Petitioner filed a petition for a rehearing and a rehearing en banc, which the Fourth Circuit denied. See (4th Cir. Case No. 08-4997, Doc. Nos. 64; 67). The Fourth Circuit issued its mandate May 4, 2010, and Petitioner timely filed the instant petition on June 17, 2011. (Crim. No. 3:06-cr-430-FDW-1, Doc. Nos. 177; 180). The Government filed the pending motion for summary judgment on October 24, 2011, and on January 13, 2012, Petitioner responded through counsel.[1]

**A. FACTS RELATING TO FRAUD ON INVESTORS, MONEY LAUNDERING,**

---

[1] Petitioner filed the petition pro se. Counsels Seth Neyhart and Kenneth Williamson subsequently appeared on Petitioner's behalf and filed a Reply on his behalf on January 13, 2012. This Court granted counsels' motion to withdraw on March 20, 2013. (Doc. No. 19).

**AND BANKRUPTCY FRAUD**

Between 1999 and 2005, Petitioner (DiBruno, Jr.), Petitioner's father (DiBruno, Sr.), and Petitioner's brother (Nick DiBruno) defrauded more than 30 victims of $3.8 million based on their false and fraudulent representations about their purported companies. (Id., Doc. No. 116 at ¶¶ 7; 61: PSR). These companies included Golden Jersey Products (a company marketing a purported dairy substitute), Internet Business Design Group (a supposed internet marketplace similar to Amazon.com), DiBruno Brothers Mining (a purported gold mine in New Mexico), KB Records (a barely functioning record company), International Food Tech (a company supposedly marketing food supplements to third-world nations), and a non-existent foreign currency exchange. (Id. at ¶¶ 8-10). None of these companies was as Defendants represented them to be, and, moreover, Defendants used the victims' money to fund their extravagant lifestyle.

As an example, in October 2002, Cindy Dimmette and her husband, Locke Holland, invested approximately $80,000 in DiBruno Brothers Mining based on numerous misrepresentations Petitioner and DiBruno, Sr. made about the mine and its functionality. (Id., Doc. No. 164 at 150-60; 200-01: DiBruno, Sr. Mot. to Withdraw Guilty Plea Tr.). Within two-and-a-half months, Defendants spent all of this $80,000 investment by writing checks to themselves, treating themselves to expensive dinners, buying merchandise at vendors such as PetSmart, and making car payments. (Id. at 200-02). Several weeks later, Dimmette and Holland, unaware of how Defendants spent their previous investment, invested an additional $275,000 in DiBruno Brothers Mining and Kolur Blynd Records. (Id. at 151-60; 197). In a matter of weeks, the Defendants spent all of this money, writing checks to themselves ($72,500 in checks to Petitioner), withdrawing about $37,000 in cash, and making numerous purchases, including from Belks, Bed Bath & Beyond, Hyatt's Gun Shop, Sumpter's Jewelers, and Tweeter

Electronics Store.  (Id. at 197-99).

As another example, in July 2003, Kenny Aronoff invested $250,000 in International Food Tech, a company Defendants said would develop a food supplement for third-world countries.  (Id. at 202-03; Doc. No. 116 at ¶ 10).  Petitioner deposited this International Food Tech investment into the KB Records bank account, and then promptly spent the money at Tweeter Electronics ($47,000), Sumpter's Jewelers ($12,900), and Hyatt Gun Shop ($2,733), by writing checks to family members and friends, and by withdrawing cash.  (Id., Doc. No. 164 at 202-04).  Defendants also spent more than $1,000 on a meal at Morton's Steakhouse.  (Id. at 203).

Petitioner also preyed on unsophisticated investors.  Ruby Wells, a 76-year-old retiree with hearing problems and unfamiliar with the internet, invested $30,000 in Internet Business Design Group based on Petitioner's representations.  (Id. at 289-97).  With Ms. Wells' retirement money, Petitioner wrote eight checks to himself totaling $28,200, as well as a $4,000 check to his brother Nick.  (Id. at 193).  Christine Bean, after working as a manual laborer at Freightliner for ten years, invested $65,000 with Petitioner in July 2005 based on his misrepresentations about a foreign currency exchange.  (Id. at 368-69).  Rather than investing Bean's money in a foreign currency exchange, Petitioner converted Bean's funds into five official checks that Petitioner's girlfriend, friends, and family members cashed for him.  (Id. at 371).  The $65,000 was cashed out just days before Petitioner filed for bankruptcy, but these transactions do not appear anywhere on his bankruptcy petition.  (Id.).  The offense conduct set forth in the PSR, the testimony adduced at the hearing on Petitioner's motion to withdraw his guilty plea, and the testimony at the subsequent sentencing hearings detail numerous other instances of the Defendants defrauding victims, depositing money into accounts designed to conceal the nature of

their fraud, and then using the money to fund their extravagant lifestyles.  See (Id., Doc. Nos. 116; 161; 162).

Once investors learned that the DiBrunos had defrauded them, several filed civil suits to collect their original investments.  (Id., Doc. No. 116 at ¶ 22).  The DiBrunos were found liable in some of these suits, which allowed the investors to levy on the DiBrunos' property.  (Id.).  The DiBrunos then sought protection from the United States Bankruptcy Court in this district by filing for Chapter 7 Bankruptcy.  (Id.).  On his Bankruptcy Petition and Statement of Financial Affairs (which he signed under oath and under penalty of perjury), Petitioner intentionally omitted that he owned an assault rifle, possessed Rolex, Breitling, and Eberhart watches, and had under his control approximately $265,000 (representing money from two investors, including Christine Bean) from June 24, 2005, to July 26, 2005.  (Id.).

If this case had proceeded to trial, the Government would have introduced two videotapes as evidence of the bankruptcy fraud.  (Id., Doc. No. 162 at 385).  First, investigators hired by victims recorded the DiBrunos and their friends removing big-screen televisions and other items from their house into a storage unit within days of filing for bankruptcy.  See (Id., Doc. No. 134 at 7: Govt. Response to Petitioner's Mot. to Withdraw Guilty Plea).  In the other videotape, the bankruptcy trustee video-recorded the inspection he conducted at Petitioner's house, during which the trustee located the expensive watches, the assault rifle, and $35,000 in cash in Petitioner's sock drawer.  (Id.; see also Id., Doc. No. 162 at 385).

## B. FACTS RELATING TO SPEEDY TRIAL ACT

Defendants were initially indicted on November 15, 2006, and Petitioner and Nick DiBruno made their initial appearance on November 17, 2006.  See (Id., Doc. No. 3).  Petitioner was ordered detained pending a detention hearing (and subsequently detained pending trial),

while Nick was released on bond.  See (Id., Doc. Nos. 8; 9; 11).  On December 1, 2006,

Petitioner appealed the detention order.  See (Id., Doc. No. 15).  DiBruno, Sr. made his initial

appearance on December 5, 2006, and was released on bond.  See (Id., Doc. Nos. 19; 20).

Calendar call for all three defendants was scheduled for January 3, 2007.  (Id., Doc. Nos. 17; 21;

23).  Nick DiBruno's attorney filed a motion to continue on December 20, 2006, asserting that he

needed more time to prepare for trial due to his recent appointment and the anticipated receipt of

voluminous discovery and that the ends of justice served by continuing the case outweighed the

interests of the public and the Defendants.  (Id., Doc. No. 29).  On January 3, 2007, the

Government filed a motion for a peremptory trial setting for July 2007, suggesting to the Court

that, with the amount of discovery and anticipated length and complexity of trial, a peremptory

setting several months later would be best.  (Id., Doc. No. 31).  Counsel for DiBruno, Sr. and

Nick DiBruno were not present at the calendar call, but Petitioner's attorney, Peter Adolf, was

present and told the Court he had no objection to scheduling the case for trial in the July 2007

term.[2]

The Court then entered an oral order granting the Government's motion for a peremptory

setting and granting Nick DiBruno's motion to continue.  See (Id., Doc. Entry dated Jan. 8,

2007).  The Court did not enter a written order and did not make any findings on the record as to

whether the delay outweighed the interests of the Defendants and the public in a speedy trial.  On

May 2, 2007, the grand jury returned a first superseding indictment, adding, in pertinent part,

overt acts describing additional victims who the Defendants had defrauded.  (Id., Doc. No. 34:

_____

[2]  In fact, DiBruno, Sr.'s attorney, Bruce Park, had made only a limited appearance at this point.
See (Id., Calendar Call Tr. at 3; Doc. No. 167 at 3: DiBruno, Sr., Initial Appearance Tr.).  Three
weeks later, Park was appointed to represent DiBruno, Sr. when DiBruno, Sr. was unable to
retain him.  See (Id., Doc. No. 33).

Superseding Indictment).  Attorney Park, DiBruno, Sr.'s attorney, knew these victims and filed a motion to withdraw on this basis.  See (Id., Doc. No. 36: Mot. to Withdraw).  Lane Williamson was then appointed to represent DiBruno, Sr. and on May 16, 2007, counsel filed a motion to continue the trial from the July term.  See (Id., Doc. Nos. 38; 39).  In his motion, DiBruno, Sr., through counsel, requested a trial setting of September 4, 2007.  As grounds for the motion to continue trial, counsel Williamson argued that he needed more time to prepare for trial because the case alleged a complex financial fraud and he also stated that he had a pre-existing scheduling conflict due to his chairmanship of the North Carolina Disciplinary Hearing Commission.  (Id., Doc. No. 39).  On May 29, 2007, the Court entered a written order granting the motion and setting the trial date for September 4, 2007.  The Court found that "the ends of justice served by taking such action outweighs the interest of the public and Defendant to a speedy trial as set forth in 18 U.S.C. 3161(h)(8)(1)."  (Id., Doc. No. 42).

DiBruno, Sr., while represented by counsel, filed a pro se Motion to Dismiss for Speedy Trial Act Violation on July 11, 2007.  (Id., Doc. No. 44).  The Government opposed the motion, arguing (1) the pro se motion should not be considered because Defendant was represented by counsel, and (2) the Speedy Trial Act had not been violated because there had not been 70 non-excludable days.  See (Id., Doc. No. 45).  The Government's opposition included the incorrect statement that the Court had found the delay outweighed the interests of the Defendants and the public when it granted the Government's motion for a peremptory setting and Nick DiBruno's motion to continue in January 2007, when, in fact, this finding was included in the court's May 2007 order.  See (Id., Doc. No. 45 at 5).  The Court entered a written order on July 20, 2007, denying DiBruno, Sr.'s pro se motion to dismiss "[f]or the reasons set forth in the Government's" Opposition to Defendant's Motion to Dismiss for Violations of the Speedy Trial

Act." See (Id., Doc. No. 46).

On August 4, 2007, one month before trial, Petitioner filed a pro se motion to appoint new counsel. (Id., Doc. No. 47). After a lengthy hearing on August 15, this motion was granted, and Richard "Andy" Culler ("Attorney Culler") was appointed to represent Petitioner. See (Id., Doc. No. 48). On the same day, the Court entered a sua sponte order, continuing the trial date from September 4, 2007, to September 17, 2007, because of Petitioner's request for a new attorney and the appointment of Attorney Culler. See (Id., Doc. No. 49). The Court recited these facts and found that because of the new appointment of counsel, "the ends of justice served by granting a continuance outweigh[ed] the best interest of the public and Defendants in a speedy trial." (Id.). The parties arrived for jury selection on September 17, 2007.

### C. DEFENDANTS PLEAD GUILTY

The Government made plea offers to Petitioner months and even days before the trial was scheduled to begin. See (Id., Doc. No. 163 at 26; 35; 37; 40; 44; 49; 127: Tr. of DiBruno, Sr. Mot. to Withdraw from 9/22/08). Petitioner turned down each of these plea offers because he thought they involved too much prison time. See (Id. at 37; 40; 44; 49). The weekend before the trial was scheduled to begin, Nick DiBruno agreed to plead guilty and cooperate against his brother and father. See (Id., Doc. No. 91: Nick DiBruno Plea Agreement; Tr. of 9/18/08 Calendar Call at 1). Based on this development, among other factors, Attorney Culler advised Petitioner that he had a slim chance of prevailing at trial. (Id., Doc. No. 163 at 27). Just before picking a jury and after consulting with Petitioner, Attorney Culler asked the Court to allow Petitioner and DiBruno, Sr. to speak privately. (Id., Tr. of 9/18/08 Calendar Call at 1-2). The Court agreed, and the courtroom cleared, with the exception of Petitioner, DiBruno, Sr., the Deputy United States Marshals, and the Defendants' attorneys, who sat in the back row. (Id.,

Doc. No. 163 at 97-98). After conferring, the Defendants directed their attorneys to approach

counsel for the Government to ask about a plea offer. (Id. at 28; 89). The parties eventually

reached an agreement, which was reduced to a written agreement. DiBruno, Sr. and Petitioner

discussed the written agreements with their attorneys and signed them that afternoon.[3] See (Id.,

Doc. No. 94 at 4: 9/17/07 Tr. of Plea & Rule 11 Hearing).

Petitioner agreed to plead guilty to Counts One (conspiracy to commit mail, securities,

and wire fraud), Two (conspiracy to commit money laundering), and Thirty-Six (Concealment of

Assets from Bankruptcy Petition) of the Superseding Bill of Indictment, and DiBruno, Sr. agreed

to plead guilty to Count One. (Id., Doc. No. 89 at ¶ 1: Petitioner's Plea Agreement; Doc. No. 90

at ¶ 1: DiBruno, Sr. Plea Agreement). Both Defendants agreed that the execution of their

agreements was "expressly conditioned on the execution of the plea agreement, and the entry and

acceptance of a guilty plea pursuant to that agreement" of the other. (Id., Doc. No. 89 at ¶ 13;

Doc. No. 90 at ¶ 13).[4] Petitioner also agreed that the loss amount was in excess of $2.5 million,

the offense involved more than ten victims, the offense involved sophisticated means, the fraud

occurred during a bankruptcy proceeding, the offense involved promotion money laundering, the

offense targeted vulnerable victims, and he served as an organizer/leader of the fraud. (Id. at ¶

7(b)). The Plea Agreement contemplated a two-level reduction in offense level for acceptance of

---

[3] Petitioner asked the Court for more time to discuss the plea agreement with his attorney, a request which the Court granted. (Id., Doc. No. 94 at 4: 9/17/07 Tr. of Plea & Rule 11 Hearing). Attorney Culler told the Court, "Your Honor, my client is still on page 4. He's had a number of questions as he's been reading and we've actually - - I actually have pulled out some of the language in the Fourth Circuit Handbook and read to him some cases that support how Plea Agreements are interpreted and analyzed by the courts, and because of that he's just a little bit behind." (Id.).

[4] Docket No. 89 of the docket report identifies that exhibit as the Plea Agreement of Petitioner, but it is actually the Plea Agreement for DiBruno, Sr. The Court relies on the Government's representations in its memorandum regarding the contents of Petitioner's Plea Agreement.

responsibility if certain conditions were met. (Id. at ¶ 7(c)-(d)). In total, including a reduction for acceptance of responsibility, the parties agreed to recommend to the Court that Petitioner's adjusted offense level was 37, with an advisory guidelines range of 210-262 months, and the Government agreed to recommend the low end of this range. (Id. at ¶ 7(b)-(e); see also Doc. No. 116 at ¶ 55: Petitioner's PSR). Petitioner also agreed that he understood the Government could withdraw from any of its obligations under the plea agreement if he breached any aspect of the agreement. (Id., Petitioner's Plea Agreement at ¶ 16). Finally, Petitioner agreed to waive his rights to appeal or collaterally attack his conviction and sentence except for on the grounds of prosecutorial misconduct or ineffective assistance of counsel. (Id. at ¶¶ 20-21).

These terms were summarized at Petitioner's Rule 11 hearing, including the adjustments and enhancements as to offense level, the linking of the plea agreements, and the appellate and § 2255 waivers. See (Id., Doc. No. 94 at 13-17). Petitioner also told the Court, under oath, that he had sufficient time to review and ask questions about his plea agreement with Attorney Culler, that he was satisfied with Attorney Culler, that he understood the maximum penalties for each offense, that the Court may impose a sentence higher than what was agreed to in the plea agreement or what his attorney previously estimated, that he was pleading guilty on his own free will because he was guilty, that he understood the appellate and § 2255 waivers, and that he was, in fact, guilty as to Counts One, Two, and Thirty-Six. (Id. at 8; 11; 13; 23-26; 30-31). At the conclusion of the hearing, the Court accepted Petitioner's and DiBruno, Sr.'s guilty pleas, finding them to be knowing and voluntary. (Id. at 31).

**D. PETITIONER AND DIBRUNO, SR., MOVE TO WITHDRAW THEIR**

**GUILTY PLEAS**

DiBruno, Sr. first filed a motion to withdraw his guilty plea on January 9, 2008, and supplemented it on September 15, 2008. See (Id., Doc. No. 102: DiBruno, Sr. Motion to Withdraw Guilty Plea; Doc. No. 130: Mem. in Support). On July 2, 2008, Petitioner filed a pro se motion to dismiss Attorney Culler and have a third court-appointed attorney. (Id., Doc. No. 118: Motion to Dismiss Appointed Counsel). The Court heard this motion on July 9 and granted the requested relief. See (Id., Docket Entry dated 7/9/08). Attorney Richard Brown was appointed to represent Petitioner at his sentencing hearing. (Id., Doc. No. 120: CJA 20).

On September 11, 2008, Petitioner, through counsel, filed a Motion to Withdraw Plea of Guilty, alleging (1) his plea agreement was not properly explained, (2) he had insufficient time to review the plea agreement, (3) Attorney Culler pressured him into signing the plea agreement, (4) he was misled regarding communications from him to the Government, (5) he was not properly advised of his rights, and (6) he was actually innocent. (Id., Doc. No. 128 at 1-2: Motion to Withdraw Guilty Plea). At the start of the September 22 hearings on Petitioner's and DiBruno, Sr.'s motions to withdraw their guilty pleas, Petitioner requested that a fourth attorney be appointed to represent him, alleging Attorney Brown had not been effective. (Id., Doc. No. 161 at 5: 9/22/08 Tr. of Petitioner's Motion to Withdraw Guilty Plea). The Court denied this request. (Id. at 7). After Attorney Brown and Petitioner consulted further, Attorney Brown advised the Court:

> He's given me some indication, and maybe – I don't think that I have – maybe I have misunderstood him. He states that he did not authorize me to file the motion to withdraw his plea. And if I have erred in doing so, without his authority or without his wishes, I would like for the Court to address that -- .

(Id. at 15-16). The Court immediately asked Petitioner whether he wanted to withdraw his guilty

plea, and Petitioner began to speak at length about his various concerns with Attorney Brown.

(Id. at 16-17). When prompted to "cut to the chase" of whether he wanted to move to withdraw his guilty plea, Petitioner stated that he wanted the "opportunity to withdraw" but on a different basis than what was filed in the written motion, and the Court told him he would be free to argue for withdrawal on any basis. (Id. at 18). After consulting again with Petitioner, Attorney Brown informed the court that Petitioner "informed [him] that he wants to move forward with the motion to withdraw" and, after further back-and-forth with the Court, Petitioner reaffirmed his intention to proceed on the motion to withdraw. (Id. at 22; 24). The Court, thus, proceeded with the hearing on DiBruno, Sr.'s motion to withdraw his guilty plea and planned to hold a separate hearing for Petitioner at the conclusion of DiBruno, Sr.'s hearing. As part of his attempt to show he was coerced into signing the plea agreement, DiBruno, Sr. called Petitioner to testify concerning what transpired the day they pled guilty. (Id. at 25-84). When asked on cross-examination whether he committed the fraudulent acts alleged in the indictment and to which he had pled guilty, Petitioner testified that "at this point I'm going to state that, no, I am not guilty of the formal indictment that's against me." (Id. at 73). Petitioner also testified that he believed his father and brother were innocent of the charges.[5] (Id. at 61-62).

The next day, before starting the hearing on Petitioner's motion, Petitioner withdrew his motion to withdraw his guilty plea. (Id., Doc. No. 162 at 142; 146: 9/23/08 Tr. of Petitioner's Motion to Withdraw Guilty Plea). He stated for the record that he had not asked for the motion to withdraw his guilty plea to be filed and explained at length why he now wanted to stick with

_____

[5] The Government was not permitted to inquire further or challenge Petitioner's new protestation of innocence because the Court limited cross-examination to Petitioner's credibility as a witness for his father, and, at that point, the parties and the Court believed Petitioner would testify again during the hearing on his motion to withdraw his guilty plea. See (Id. at 73-74).

his guilty plea.  (Id. at 139).  After more back-and-forth with the Court, Petitioner reaffirmed that

he was "guilty" of conspiring to commit fraud and concealing assets during the bankruptcy

proceedings.  (Id. at 148-49).  When asked whether he committed money laundering, Petitioner

asked for a clarification from the Court as to what constituted money laundering:

> THE COURT: All right. You were taking money that you had received from the
> fraud you just admitted you did, and you ran it through a – one or more
> transactions so that you were either trying to hide the source, nature, control or
> location of that money, or you were using that money in a way to come back and
> further or promote the fraud that you've already committed. Did you do that?
>
> DIBRUNO, JR.: Guilty.

(Id.).  The Court denied DiBruno, Sr.'s motion to withdraw his guilty plea and proceeded to the

sentencing hearings for both Defendants.

### E. SENTENCING HEARINGS

After Attorney Brown was appointed to represent Petitioner, Attorney Brown moved to

continue the sentencing hearing (which was scheduled for September 2, 2008) to provide him

more time to prepare.  (Id., Doc. No. 122: Motion to Continue Docket Call/Trial, Motion to

Continue Sentencing).  The Court granted this motion and continued Petitioner's sentencing

hearing and the hearing on DiBruno, Sr.'s motion to withdraw his guilty plea to September 22,

2008.  (Id., Docket Entries Dated 8/27/08).  Attorney Brown filed a second motion to continue

the sentencing hearing, citing as grounds that he needed more time to prepare for the sentencing

hearing and the hearing on the motion to withdraw the guilty plea, and that a conflict "may have

arisen" regarding Petitioner's motion to withdraw his guilty plea.  (Id., Doc. No. 129 at 1).  The

Court denied this motion.  (Id., Doc. No. 133).

At the close of the first day on the hearing on the motions to withdraw guilty pleas, the

Court stated the following day's hearing would be started later to afford Petitioner and Attorney

Brown more time to confer on his objections to the PSR.  (<u>Id.</u>, Doc. No. 161 at 131-35).

Attorney Brown noted for the record that Petitioner wanted him to move to continue the

sentencing hearing one more time so he could track down a witness who could "refute a

statement that is made in the PSR by one of the alleged victims in this matter."[6] (<u>Id.</u> at 132).

The Court denied the motion, stating that hearsay evidence is admissible at a sentencing hearing

and that Petitioner could testify to the alleged hearsay.  (<u>Id.</u>).  At the start of the hearing the next

day, Petitioner told the Court that Attorney Brown had not answered "every question" but that he

answered "a good majority" of his questions.  (<u>Id.</u>, Doc. No. 162 at 6; Sentencing Hrg. Tr. at 458

(stating that he reviewed his PSR and Attorney Brown answered his questions about the PSR).

At the sentencing hearing, the Government objected to the PSR's failure to include a two-

level enhancement for vulnerable victim under U.S.S.G. § 3A1.1.  In support of the objection,

Ruby Wells testified that she was 76 years old, hard of hearing, and unfamiliar with the internet

when Petitioner approached her about investing in Internet Business Design Group.  (<u>Id.</u> at 425-

35).  Robert Vance Cheek testified that the DiBrunos had him sign sale documents on a Ford

truck while he was hospitalized following his bypass surgery and following his wife's recent

diagnosis of lung cancer.  (<u>Id.</u> at 439-45).  The Court sustained the objection and applied the two-

level enhancement.  (<u>Id.</u> at 450-51).

Next, the Government argued that Petitioner should not receive a two-level reduction for

acceptance of responsibility because (1) irrespective of whether he wanted the written motion

filed, he affirmed in Court that he wanted to go forward with the motion to withdraw his guilty

plea, and (2) he testified during DiBruno, Sr.'s hearing that he was actually innocent of these

---

[6]  This witness apparently would have refuted a victim's statement that her husband suffered
severe depression and eventually took his own life as a result of losing their money to the
DiBrunos.

charges.  (Id. at 453).  The Court, noting the issue was "a real close call," overruled this

objection and awarded Petitioner the two-level reduction because he ultimately decided to plead

guilty.  (Id. at 456-57).  The Court, however, found that Petitioner breached his plea agreement

with his conduct the day before (affirming he wanted to go forward with the motion to withdraw

and falsely testifying that he was actually innocent of the charges) and relieved the Government

of its earlier agreement to recommend the low end of the guideline range.  (Id. at 457; 459).

Following Petitioner's lengthy allocution, testimony from some of Petitioner's victims, and

arguments from both sides on an appropriate sentence, the Court sentenced Petitioner to 262

months of imprisonment, the high end of the advisory guideline range.[7]  (Id. at 529; 535; see also

Doc. No. 142: Judgment).  Petitioner was ordered to pay restitution to each of the victims,

totaling $3,808,487.  (Id.).

**F. APPEAL**

Counsel for Petitioner filed a brief under Anders v. California, 386 U.S. 738 (1967),

raising as issues ineffective assistance of counsel, whether the Government breached the plea

agreement, and judicial basis at sentencing.  See (4th Cir. Case No. 08-4997, Doc. No. 29).

Petitioner filed a pro se supplemental brief raising as issues whether his counsel was ineffective

for failing to file a motion to dismiss for a Speedy Trial Act violation, whether counsel was ill-

prepared to recommend acceptance of Petitioner's guilty plea, and whether Petitioner's plea was

knowing and voluntary.  See (Id., Doc. No. 48).  In an unpublished opinion, the Fourth Circuit

rejected each of these arguments and affirmed the conviction and the sentence.  See DiBruno,

370 Fed. Appx. at 390-92.  With regard to Petitioner's Speedy Trial argument, the Fourth Circuit

---

[7]  The Court sentenced DiBruno, Sr. to the statutory maximum of five years of imprisonment and
a consecutive six months of imprisonment for contempt of court.  (Id. at 421; 475).

simply stated, "We have reviewed these claims and find them to be without merit." Id. at 392. Petitioner petitioned for rehearing and rehearing en banc, alleging that the panel decision did not consider the effect of United States v. Santos, 553 U.S. 507 (2008), and asked the panel to reconsider the Speedy Trial Act issue. See (4th Cir. Case No. 08-4997, Doc. No. 64). The Fourth Circuit denied this motion and issued its mandate on May 4, 2010. (Id., Doc. Nos. 67; 68).

### G. PETITIONER'S 2255 ALLEGATIONS

Petitioner has now filed a motion under § 2255 to vacate, set aside, or correct his sentence in which he alleges twelve grounds of relief. He describes his grounds for relief as "issues" on pages 14-16 of his pleading and expands on his issues in a separate 70-page memorandum. Issues One, Two, and Three allege ineffective assistance of counsel based on counsel's failure to file a motion to dismiss based on a violation of the Speedy Trial Act. In Issue Four, Petitioner alleges ineffective assistance of counsel based on counsel's failure to negotiate and make counter-offers to the Government during plea negotiations and that counsel "lied" to Petitioner about offers he instructed counsel to make. For Issue Five, Petitioner alleges that Brown was ineffective for filing a motion to withdraw his guilty plea without Petitioner's knowledge. Issues Six and Seven relate to Petitioner's claim that Attorney Culler failed to fully investigate the case and call certain people as witnesses. In Issue Eight, Petitioner alleges ineffective assistance based on counsel's failure to dismiss the money laundering charges based on the Supreme Court's decision in United States v. Santos, 553 U.S. 507 (2008). In Issue Nine, Petitioner alleges that counsel was ineffective because counsel denied Petitioner the opportunity to review discovery. Issues Ten, Eleven, and Twelve relate to Petitioner's contention that his guilty plea was involuntary and that counsel rendered ineffective assistance during the two times

16

Petitioner entered a guilty plea.

Attorneys Brown and Culler provided affidavits to the Government responding to Petitioner's claims against them.  See (Doc. Nos. 9-1; 9-2: Exhibits A ("Culler Affidavit") and B ("Brown Affidavit").  In his affidavit, Attorney Culler summarized his preparation for trial, his conversations with Petitioner concerning pre-trial plea negotiations, and his discussions with Petitioner concerning the plea agreement Petitioner entered with the Government on the day of trial.  (Doc. No. 9-1).  Specifically, Attorney Culler detailed a meeting he had with Petitioner and the investigator assigned to the case on August 21, 2007, wherein they discussed the trial, possible defenses, and defense witnesses to subpoena for trial.  See (Id. at ¶¶ 6; 7).  Attorney Culler described the time he spent preparing for trial, reviewing the witness statements and other discovery, subpoenaing witnesses, and discussing defenses with Petitioner.  (Id. at ¶ 10).  Attorney Culler also stated that he reviewed the discovery in detail with Petitioner and that, from his interactions with Petitioner, Attorney Culler observed that Petitioner had already reviewed the discovery "in detail well before" he was appointed.  (Id.).

Attorney Culler also described his interactions with Petitioner regarding plea negotiations.  At their August 21 meeting, Attorney Culler told Petitioner that he intended to spend the few weeks he had preparing for trial but would forward any plea offers from the Government or communicate to the Government plea offers from Petitioner.  (Id. at ¶ 5).  On August 28, when Attorney Culler met with Petitioner again, he communicated a plea offer from the Government which contemplated a sentencing range of 151-188 months, which they proceeded to discuss in detail.  (Id. at ¶ 8).  Petitioner proposed a counter-offer of 24 months of imprisonment if Nick DiBruno received a probationary sentence, which Attorney Culler communicated to the Government.  (Id.).  Attorney Culler wrote Petitioner a letter the next day

confirming that he had communicated the counter-offer and that the Government had rejected it. (Id.). The letter also described the risks Petitioner faced if he proceeded to trial and estimated the "extensive imprisonment" Petitioner would face if convicted of just a few of the many charges he faced. (Id.; Doc. No. 9-1 at 9: Letter from Culler to Petitioner dated Aug. 29 2007, Ex. A to Culler Aff.). Regarding the day-of-trial plea negotiations, Attorney Culler makes clear that these negotiations were initiated by Petitioner and that counsel did not recommend that Petitioner enter into the day-of-trial plea agreement with the Government. (Id. at ¶¶ 11; 12). Attorney Culler asserts in his affidavit that, based on his interactions with Petitioner on the day of trial, Petitioner appeared to fully understand the consequences of the guilty plea. (Id. at ¶ 13).

Attorney Brown also provided an affidavit responding to Petitioner's claims. (Doc. No. 9-2). In his affidavit, Attorney Brown related the conversations he had with Petitioner concerning a potential motion to withdraw his guilty plea. (Id. at 1-2). Petitioner was aware that Attorney Brown was preparing a written motion to withdraw the guilty plea, but Attorney Brown does not recall whether they had a specific discussion as to whether Petitioner authorized counsel to actually file it. (Id.). Attorney Brown then related what occurred at the hearings on September 22-23, 2008, in which Petitioner was given the opportunity to withdraw the motion to withdraw but chose to proceed (before changing his mind again the next day). (Id.).

Regarding his alleged lack of preparation at the sentencing hearing, Attorney Brown described his preparation, including that he prepared as he does for all sentencing hearings, by reviewing discovery, reviewing the PSR, speaking with the client, and making an independent guideline calculation. (Id. at 3). In his affidavit, Attorney Brown "completely den[ies] any allegation that [he] was unprepared." (Id.).

**II. STANDARD OF REVIEW**

**A. Section 2255**

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief. If a petitioner's motion survives initial review and once the Government files a Response, the Court must then review the materials submitted by the parties to determine whether an evidentiary hearing is warranted under Rule 8(a) of the Rules Governing Section 2255 Proceedings. After having considered the record in this matter, including the parties' summary judgment materials, the Court finds that this matter can be resolved without an evidentiary hearing. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

**B. Summary Judgment**

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

**C. Ineffective Assistance of Counsel Standard of Review**

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced Petitioner. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

## III.    DISCUSSION

### 1.  Speedy Trial Act (Issues 1, 2, and 3)

The Speedy Trial Act ("STA") requires that a defendant be brought to trial within 70 days of the filing of the indictment or his initial appearance, whichever is later. 18 U.S.C. § 3161(c)(1). The STA sets forth a lengthy list of exclusions from the 70-day requirement, including delay resulting from the filing of any pre-trial motion (§ 3161(h)(1)(D)), reasonable delay when the defendant is joined for trial with a codefendant for whom the 70 days has not run (§ 3161(h)(6)),

or any period of delay resulting from a continuance granted by a judge on its own motion, or

upon motion of the defendant or the Government when the court sets forth orally or in writing its

reasons for finding that the ends of justice served by granting the motion for continuance

outweigh the interests of the public and the defendant in a speedy trial (§ 3161(h)(7)(A)).  See

also Zedner v. United States, 547 U.S. 489, 507 (2006) (holding that a violation of the STA is

not subject to harmless error review and stating that "[w]ithout on-the-record findings there can

be no exclusion under § 3161(h)").  The STA states that one of the factors a court should

consider is whether the case is so complex that 70 days would leave an unreasonably short period

of time to prepare for trial.  See 18 U.S.C. § 3161(h)(7)(B)(ii).

If the STA is violated, the indictment "shall be dismissed on motion of the defendant."

Id. § 3162(a)(2).  While the court must dismiss the indictment, it has wide discretion to dismiss

the case with or without prejudice.  In considering whether to dismiss the case with or without

prejudice, the STA directs the court to consider, among other factors, "the seriousness of the

offense; the facts and circumstances of the case which led to the dismissal; and the impact of a

reprosecution on the administration of this chapter and on the administration of justice."  Id.

Though not dispositive, "the presence or absence of prejudice to the defendant" is "relevant for a

district court's consideration" along with the third factor.  United States v. Taylor, 487 U.S. 326,

334, 341 (1988); see also United States v. Rushin, 642 F.3d 1299, 1304 (10th Cir. 2011)

("Absent a showing of appreciable prejudice to the defendant, a district court generally should

dismiss serious charges without prejudice under § 3162(a)(2) unless the delay is extended and

attributable to 'intentional dilatory conduct, or a pattern of neglect on the part of the

Government.'") (quoting United States v. Saltzman, 984 F.2d 1087, 1093 (10th Cir. 1993)).  A

dismissal without prejudice allows the Government to seek a new indictment within six calendar

months of the date of dismissal in the event the statute of limitations has run. 18 U.S.C. § 3288. A defendant waives his right to dismissal of the indictment if he fails to move for dismissal prior to trial or entry of a guilty plea. Id. § 3162(a)(2).

A defendant's right under the STA is distinct from his Sixth Amendment right to a speedy trial. United States v. Woolfolk, 399 F.3d 590, 594-98 (4th Cir. 2005). The Supreme Court's holding in Barker v. Wingo, 407 U.S. 514 (1972), controls the analysis of a Sixth Amendment claim. Under Barker, a court must consider four factors in determining whether a defendant's constitutional right has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the extent of prejudice to the defendant. Id. at 530. Regarding the length of the delay, delays exceeding one year are generally "presumptively prejudicial," but delays of less than one year are generally not. See United States v. Ingram, 446 F.3d 1332, 1336 (11th Cir. 2006); see also United States v. MacDonald, 635 F.2d 1115, 1117 (4th Cir. 1980) (finding that a seven-month delay was "entirely too short to 'trigger' further inquiry" under Barker).

Here, based on Nick DiBruno's motion to continue, the Government's motion for peremptory setting, and Attorney Adolf's express agreement to a July 2007 trial term, the Court entered an oral order at the January 3, 2007, calendar call setting the case for trial on July 7, 2007. The oral order did not include any on-the-record findings. The STA clock started to run on November 17, 2006, the date Petitioner made his initial appearance, although the time period from December 1, 2006, to January 17, 2007, is excluded, as Petitioner's appeal of the detention order was pending during that time. The Government concedes that, with these exclusions, and with the acknowledgement that the Court's January 3 oral order did not satisfy the on-the-record findings requirement set forth in § 3161 and Zedner, the 70-day STA period ran sometime in

March 2007.  The days between May 7 and 8, when DiBruno, Sr.'s attorney filed a motion to withdraw from further representation and the Court ruled on this motion, are excluded, as are the days between May 16 and 29, when DiBruno, Sr.'s new court-appointed attorney filed a motion to continue.  The Court granted this motion on May 29, and the subsequent days should be excluded, as the Court set forth in a written order its finding that "the ends of justice served by taking such action outweigh[ed] the interest of the public and Defendant to a speedy trial as set forth in 18 U.S.C. § 3161(h)(8)(1)."  See (Crim. Case No. 3:06cr430-FDW, Doc. No. 42).  Assuming that these summary findings were insufficient and that the STA clock started running again on May 30, the clock stopped on August 4, 2007, when Petitioner filed a pro se motion to appoint new counsel.  This motion was resolved on August 15 with the appointment of new counsel and, later that day, the Court entered an order, sua sponte, continuing the case from September 4 to September 17, with specific findings, in compliance with § 3161 and Zedner.

Petitioner alleges that all three of his trial attorneys were ineffective for failing to move to dismiss the indictment based on a violation of the STA or the Sixth Amendment.  In support of the summary judgment motion, the Government first contends that Petitioner has not shown that counsel was deficient for failing to file a motion to dismiss based on a Speed Trial Act violation.  The Court agrees.  As the Tenth Circuit recently explained:

> [N]ot every decision on the part of defense counsel to forego filing a motion to dismiss upon an apparent violation of the STA is suspect under Strickland's first prong.  Unlike a panel of federal appellate judges, defense counsel observes the relevant proceedings, knows of materials outside the record, and interacts with the client, with opposing counsel, and with the trial judge.
> ....
> . . . [A] reasonable attorney in the sound exercise of his or her professional judgment arguably might have decided to forego the filing of a motion to dismiss the indictment as largely ineffective, an imprudent use of limited resources, or even unwarranted gamesmanship.

Rushin, 642 F.3d at 1307-08. The reasoning of the Tenth Circuit applies equally to the facts in this case. Attorney Adolf reasonably may have decided to forego filing a motion to dismiss based on a reasonable belief that any dismissal would have been without prejudice, given his express agreement to a July trial date. He reasonably would have understood the Court's frustration at an attorney agreeing to a date in the future, silently lying in wait for a STA violation, and then filing a motion to dismiss on the STA violation. Even if counsel did not believe there was a STA violation, it was not unreasonably held at the time, given the Government's motion for a peremptory setting, counsel's express agreement to that setting, and the fact that the date was only several months after the return of a lengthy and complex fraud indictment. Attorney Culler may have also reached the same conclusions, reasonably believing that the filing of such a motion would result in a dismissal without prejudice, re-indictment, and a return to the same position he and his client were in. In sum, it cannot be said that counsels' decision to forego the filing of a motion to dismiss was so far outside the realm of reasonable legal strategy as to implicate Strickland's deficient performance prong. Finally, as the Government notes, the case is even stronger with Attorney Brown, who was appointed to represent Petitioner at sentencing. Petitioner waived any right he had to allege a STA violation after he pled guilty, so Attorney Brown's decision not to file a motion to dismiss was not only reasonable, it was also wise.

Counsels' failure to file a motion to dismiss based on a Sixth Amendment speedy trial violation was also not ineffective assistance. Any motion grounded in the Sixth Amendment would not have survived the first Barker factor, as the first trial setting was scheduled approximately seven-and-a-half months after the return of a lengthy and complex multi-million dollar fraud indictment, and the second trial setting was scheduled within ten months of the

24

return of the indictment. Both settings are below the threshold "presumptively prejudicial" one-year delay. Moreover, the first trial setting was set with the express agreement of Attorney Adolf, and the subsequent September settings were the result of DiBruno, Sr.'s counsel's conflict and Petitioner's decision to seek a second court-appointed attorney a month before trial. The Court finds that the Government was in no way dilatory or even complicit in pushing the trial to September, and the Court notes that it would have denied a motion under the Sixth Amendment. Thus, counsels' failure to file a motion on this basis did not rise to the level of "deficient performance."

The Court further finds that, even if Petitioner could show deficient performance, he could not show the prejudice prong of <u>Strickland</u>. While dismissal of an indictment based on a STA violation is automatic, dismissal with prejudice is not, and the facts in this case would not have warranted dismissal with prejudice. Petitioner, therefore, cannot show that there was "a reasonable probability," sufficient to "undermine confidence in the outcome," that the result of the proceeding would have been different if counsel had argued a STA or Sixth Amendment violation. <u>See</u> <u>Strickland</u>, 466 U.S. at 694. Numerous courts have considered this same issue in the context of a § 2255 petition, and all have found that the petitioner did not demonstrate <u>Strickland</u> prejudice. For example, in <u>United States v. Rushin</u>, the Tenth Circuit found that the non-exclusive factors set forth in § 3162(a)(2) "bound the district court's discretion in such a manner that we may say, with a degree of confidence, that the district court would have abused its discretion in dismissing the indictment other than without prejudice." <u>Rushin</u>, 642 F.3d at 1308. The court reasoned that the charges (six armed robberies) were very serious and that the defendant was complicit in most of the non-excludable delay. <u>Id.</u> Therefore, the court dismissed the claim that the defendant "was somehow prejudiced because he was tried and convicted on an

indictment that should have dismissed without prejudice." <u>Id.</u> at 1309. The court also rejected the defendant's suggestion that he suffered prejudice merely because dismissing the indictment (even without prejudice) would have changed "those court processes related to a particular indictment," instead finding that the defendant had not shown that the outcome of his proceeding would have differed in any meaningful sense if the indictment had been dismissed without prejudice. <u>Id.</u> at 1309-10. "Rather, in all likelihood, the Government would have reindicted Defendant, placing him in the same posture as before the dismissal." <u>Id.</u> at 1310 (citing <u>Zedner</u>, 547 U.S. at 499).

Several other circuits, including the Fourth Circuit, have reached the same conclusion where an indictment would have been dismissed without prejudice. In <u>United States v. Thomas</u>, the Fourth Circuit considered whether trial counsel was ineffective under <u>Strickland</u> for failing to move to dismiss an indictment based on a STA violation following the defendant's conviction on drug trafficking and firearm charges. <u>United States v. Thomas</u>, 305 Fed. Appx. 960 (4th Cir. 2009) (unpublished). There, the defendant claimed that he was prejudiced from the violation of the STA and counsel's failure to move to dismiss because a co-defendant died before the start of trial and was unavailable to provide what the defendant maintained would be exculpatory testimony. <u>Id.</u> at 962. In concluding that the defendant did not suffer prejudice, the court reasoned that the length of the delay, the seriousness of the charges, and "the lack of evidence of prosecutorial neglect or misconduct causing the delay would have, at most, resulted in a dismissal without prejudice." <u>Id.</u> at 964. The court further concluded that the death of the co-defendant occurred before the STA violation and therefore had not prejudiced the defendant. <u>Id.</u>

The Eleventh Circuit reached a similar conclusion in <u>United States v. Chambliss</u>, concluding that a petitioner had not suffered prejudice based on his counsel's failure to move to

dismiss an indictment following a violation of the STA.  384 Fed. Appx. 897, 899 (11th Cir.

2010) (unpublished).  The court reasoned that, if had counsel had moved to dismiss the

indictment, the district would have granted dismissal without prejudice, given the seriousness of

the charges and that the delay did not harm petitioner's ability to present a defense.  Id.  The

government would have then re-indicted the petitioner on the same charges, and "the outcome of

the proceedings would not have been different had counsel moved to dismiss the indictment."

Id.  The court accordingly held that the petitioner had not demonstrated prejudice.  Id.  See also

Campbell v. United States, 364 F.3d 727, 731 (6th Cir. 2004); United States v. Dean, No.

3:09cv24, 2010 WL 3958673, at *11 (N.D. Fla. Sept. 7, 2010); United States v. Osborne, No.

4:05-cr109-12-JLH, 2010 WL 5283297, at *11 (E.D. Ark. Dec. 16, 2010).

Here, Petitioner's only chance of prevailing on his ineffective assistance claim hinges on

his contention that the Court would have dismissed the indictment with prejudice if counsel had

moved to dismiss based on a STA of Sixth Amendment.  Petitioner cannot show, however, that

the Court would have dismissed the indictment with prejudice.  To the contrary, as in Rushin, for

this Court to have dismissed the indictment with prejudice would likely have been an abuse of

this Court's discretion.  First, the charges against Petitioner were very serious, as he was charged

with perpetrating a $3 million fraud on dozens of victims, massive money laundering, and

attempting to defraud the federal bankruptcy court by concealing expensive assets from his

bankruptcy petition.  Cf. United States v. Dean, 2010 WL 3958673, at *11 (violations of the tax

code are serious enough to favor dismissal without prejudice).  Second, the facts and

circumstances leading to the hypothetical dismissal weigh in favor of dismissal without

prejudice.  The Government filed a motion for a peremptory setting requesting a trial in seven

months, which was not an unreasonable delay given the complexity of the case, volume of

discovery, and expected length of the trial.  Before the Government filed this motion, Petitioner's co-defendant Nick DiBruno had already filed a motion to continue, and at the calendar call discussing a trial setting, Petitioner's counsel expressly agreed to a July trial.  The subsequent delays were the result of a co-defendant's counsel's conflict and subsequent appointment of new counsel (continuing the trial from July to September) and from Petitioner's own motion for a new attorney one month before the anticipated start date.  The Government was not complicit in any delay past the July trial, and either Petitioner or a co-defendant was complicit in every single delay.  Finally, the setting of such a complex and lengthy trial ten months after the return of the indictment is not such an unusual delay as to trigger Sixth Amendment scrutiny or to interfere with Petitioner's ability to mount a defense.  Petitioner correctly alleges that a witness died in July 2008, but this occurred after Petitioner entered his guilty plea and very likely after a court would have scheduled the hypothetical new trial even if the original indictment had been dismissed.

Given these facts, even if either of Petitioner's pre-guilty plea counsel had moved to dismiss the indictment based on a violation of the STA, the dismissal would have been without prejudice, the Government would have re-indicted him at the next available grand jury, and Petitioner would have found himself in the same position he was in on September 17, 2007, when he entered his plea of guilty.  In sum, Petitioner simply cannot show that the outcome of this proceeding would have differed in any meaningful sense if counsel had moved to dismiss and, thus, he cannot show prejudice under Strickland.

In response to the summary judgment motion, Petitioner contends that the motion to vacate should be granted based on the Fourth Circuit decision in United States v. Henry, in which the Fourth Circuit Court of Appeals held, on direct appeal from the defendants, that a

violation of the STA required that the defendants' sentences be vacated and remanded to the district court to determine whether the dismissal of the indictment would be without or without prejudice. 538 F.3d 300, 306 (4th Cir. 2008). Petitioner contends that, in analyzing Petitioner's ineffective assistance of counsel claim, the issue before this Court is not whether the indictment would be dismissed with or without prejudice but, whether Petitioner would have pled guilty or insisted on proceeding to trial, given the STA violation. Petitioner insists that if the Court had dismissed the indictment without prejudice based on a STA violation, he would have refused to plead guilty and he would have insisted on proceeding to trial. Petitioner's contention fails. Here, Henry was decided on direct appeal, and the Fourth Circuit there reversed the defendants' conviction based on a STA violation. Henry did not address a claim for ineffective assistance of counsel and it, therefore, did not even apply the Strickland analysis. Henry merely stands for the proposition that a violation of the STA requires dismissal of the indictment, either with or without prejudice, in the discretion of the district court. Moreover, other district courts in this circuit have held that a Section 2255 petitioner could not show ineffective assistance of counsel based on counsel's failure to bring a speedy trial motion where the petitioner was "unable to demonstrate a 'reasonable probability' that any speedy trial motion tendered by his counsel would have been granted." Plunkett v. United States, No. 4:09cv80205, 2011 WL 2199174, at *5 (W.D. Va. June 6, 2011) (quoting Strickland, 466 U.S. at 694).

In sum, Petitioner's claim of ineffective assistance of counsel based on counsels' failure to file a motion to dismiss based on a violation of the STA or under the Sixth Amendment is without merit.

### 2. Review of Discovery (Issue 9)

Petitioner also contends his attorneys were ineffective because they denied him the opportunity to review any discovery other than interview reports. In support of the summary judgment motion, Attorney Culler stated in his affidavit that he discussed the discovery at length with Petitioner and, moreover, that Petitioner already appeared extremely familiar with the discovery by the time Attorney Culler was appointed to represent him. Furthermore, through three attorneys, two separate motions for a new attorney, and multiple hearings, Petitioner never complained to the Court that he did not have access to discovery. Throughout the proceedings, Petitioner was quite willing to alert the Court to what he perceived as injustices against him, so it is beyond belief that Petitioner's attorneys were repeatedly denying him access to discovery and he never alerted the Court to this problem. It is also implausible that all three separate attorneys would deny Petitioner access to discovery.

The Court further observes that, even assuming that Petitioner did not have the access he would have liked to discovery, he has not pointed to anything in the discovery (or even what he imagines to be in the discovery) that is somehow exculpatory or would have convinced him to plead not guilty and proceed to trial. He cannot, therefore, show prejudice under <u>Strickland</u>. To the extent Petitioner is complaining about the fact that his attorneys did not leave hard copies of the discovery with him at the jail, that claim also does not warrant relief. The Government's open file discovery policy precludes leaving copies of the discovery with a criminal defendant, and Petitioner signed the Open File Discovery Agreement agreeing to this term. Petitioner has failed to show how this procedure prejudiced him. In sum, Petitioner's claim that counsels denied him access to discovery is without merit.

### 3. Investigation and Preparation of Defenses (Issues 6 and 7)

Petitioner next accuses Attorney Culler of being ineffective for failing to adequately investigate his case and prepare a defense.[8]  In response, and in support of the summary judgment motion, Attorney Culler has submitted his affidavit in which he details meetings he had with Petitioner in which they discussed the evidence, possible defenses, and defense witnesses.  Attorney Culler explained that, although he had a short amount of time to prepare for trial as a result of his recent appointment, he worked extremely diligently to prepare for trial.  (Doc. No. 9-1 at ¶¶ 5-7).  Attorney Culler also points to the hours he worked on Petitioner's case and the number of subpoenas and a writ he requested from the Court for trial.  (Id.).  Petitioner has not presented any evidence in response to the summary judgment motion raising a genuine issue of material fact as to whether attorney Culler adequately prepared for Petitioner's defense.[9]  Indeed, in his Reply brief, Petitioner cites to no facts whatsoever to support his contention that Attorney Culler was somehow deficient in preparing a defense for Petitioner.  Petitioner merely states, in wholly conclusory fashion, that counsel "grossly failed" in his obligation to prepare a defense.  (Doc. No. 14 at 24).  In any event, Petitioner has not shown that he was prejudiced from any alleged lack of preparation.

In sum, Petitioner has failed to show that attorney Culler was ineffective based on his

---

[8]   Petitioner accuses Attorney Culler of suffering from an addiction to prescription painkillers during Culler's representation of Petitioner.  See (Doc. No. 1-1 at 15-18: Pet. Mem.).  This accusation is, first of all, contradicted by Attorney Culler's affidavit.  See (Doc. No. 9-1 at ¶ 14).  Second, Petitioner offers no competent proof in support of this claim, providing only his self-serving accusations and an uncorroborated affidavit of another inmate.  Third, assuming for the sake of argument that this accusation was true, Petitioner fails to prove that he would have proceeded to trial but for the suggested impairment of Attorney Culler.

[9]   The Government points out that Attorney Culler asserted in his affidavit that it was Petitioner's idea to approach the Government and ultimately plead guilty on the day of trial, and that Culler did not recommend this course of action to Petitioner.  See (Doc. No. 9-1 at ¶¶ 12; 13).  The Government argues that an unprepared attorney would not have tried to dissuade his client from pleading guilty on the day of trial.

alleged failure to prepare for trial.

### 4. Plea Negotiations (Issues 4, 10, and 12)

Petitioner also claims that Attorney Culler provided ineffective assistance of counsel in various way during plea negotiations. For instance, Petitioner now claims that Attorney Culler coerced him into pleading guilty. Petitioner's claim that Culler coerced him into pleading guilty is blatantly contradicted by the record in this case. First, Petitioner's current claim contradicts his earlier sworn testimony at his father's motion to withdraw his guilty plea. As this Court found, Petitioner did not coerce his father into pleading guilty, and Attorney Culler did not coerce his client into pleading guilty.[10] (Id., Doc. No. 139: Order of Contempt as to DiBruno, Sr.). Second, Petitioner's claim is contradicted by Attorney Culler's affidavit, which details how Petitioner sought out the guilty plea from the Government on the morning of trial and that Attorney Culler actually advised his client against accepting the day-of-trial plea offer. See (Doc. No. 9-1 at ¶¶ 12; 13). Attorney Culler's account of the events is further corroborated by the testimony of DiBruno, Sr.'s trial counsel, Lane Williamson, at the hearing on DiBruno, Sr.'s motion to withdraw his guilty plea. At that hearing, Attorney Williamson described his observations of a calm discussion between Petitioner and DiBruno, Sr. as to whether to plead guilty.[11] (Id., Doc. No. 163 at 92; 97-104; 112-13; 118; 121: Tr. of DiBruno, Sr. Mot. to Withdraw from 9/22/08).

---

[10] Indeed, the Court found DiBruno, Sr. in contempt of court and added six months to his sentence based on DiBruno, Sr.'s "perjury, abuse of judicial process, and an attempt to perpetuate a fraud on the Court, for the purpose and with the effect of obstructing the administration of justice" arising out of DiBruno, Sr.'s motion to withdraw his guilty plea and his testimony at the hearing on the motion. (Id., Doc. No. 139 at ¶ 6: Order of Contempt as to DiBruno, Sr.).

[11] The Government argues that Attorney Williamson, then the head of the North Carolina Bar's Disciplinary Hearing Commission, would have alerted the Court if he had observed Attorney Culler pressuring his client to enter into that agreement.

Petitioner makes numerous spurious allegations throughout his memorandum relating to this claim, but each allegation is contradicted by the record. For example, Petitioner now claims that he encouraged his attorneys to work out a guilty plea for him, as he thought this was the wisest course of action for him. This claim is simply contradicted by the record in that the record shows that Petitioner was offered, but refused to accept, various pleas from the Government. Petitioner testified at his father's motion to withdraw hearing that he had repeatedly turned down plea offers from the Government because he thought those offers involved too much prison time. (Id., Doc. No. 163 at 25; 36-37; 40; 42-44; 48-49). Petitioner also contends that Attorney Culler lied to him about counter offers Petitioner wanted communicated to the Government, but this assertion is contradicted by the August 29, 2007, letter attached to Attorney Culler's affidavit.[12] Finally, Petitioner contends that all of his attorneys gave incorrect estimates of the amount of prison time Petitioner faced. Again, this allegation is also contradicted by the letter attached to Attorney Culler's affidavit, in which Culler stated that he advised Petitioner to propose a plea to the Government "for no less than five years imprisonment in light of your likely trial exposure of well in excess of 20 years in prison (by my best estimate at this time)." (Doc. No. 9-1 at 8). In any event, even if it were true that counsel gave Petitioner incorrect estimates of potential prison time, this was cured by the Rule 11 colloquy in which Petitioner acknowledged the maximum sentences and that any estimate of imprisonment from his attorney was only an estimate. Petitioner's claims surrounding plea

---

[12]  Attorney Culler stated in the letter that he was confirming that that they had met the previous day to discuss Petitioner's plea options. Counsel further stated in the letter that he had informed the Government of Petitioner's counter offer of 24 months imprisonment, but Culler informed Petitioner that the Government had repudiated the offer. Culler went on to state that "[a]t this point, I feel I have done all that is possible in regard to the plea negotiations in this case due to the huge chasm between your expectations and those of the United States government." (Doc. No. 9-1 at 9).

negotiations and his guilty plea are incredible and contradicted by the record.

In sum, Petitioner has failed to show that attorney Culler was ineffective during plea negotiations.

### 5. United States v. Santos (Issue 8)

Petitioner also contends that he received ineffective assistance of counsel because Attorneys Culler and Brown failed to advise him of what he contends are the correct elements of promotion money laundering as explained in United States v. Santos, 553 U.S. 507 (2008). (Doc. No. 1-1 at 64). He contends that this "correct" definition would have precluded him from pleading guilty to the money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). This claim fails for three reasons. The claim fails, first, because there was no risk of merger in his case. Money laundering requires proof that the defendant conducted a transaction knowing that the property involved represented the proceeds of a specified unlawful activity ("SUA"), and that the defendant conducted the transaction with the intent to promote the unlawful activity. 18 U.S.C. § 1956(a)(1). In Santos, the Supreme Court addressed whether the term "proceeds" means "receipts" or "profits" when illegal gambling is the underlying specified unlawful activity. Santos, 553 U.S. at 509-10. To avoid a merger of the two crimes of money laundering and gambling, the Court held that "proceeds" meant "net profits," not "gross receipts," of the illegal gambling business, or else "nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." Id. at 515. Because Santos was a plurality decision, the holding is the position taken by the members who concurred in the judgment on the narrowest grounds. Marks v. United States, 430 U.S. 188, 193 (1977). In Santos, that meant this definition of "net profits" as proceeds was limited to the

illegal gambling statute.  United States v. Halstead, 634 F.3d 270, 278-79 (4th Cir. 2011).

The Fourth Circuit recently considered the application of Santos to a defendant convicted of health care fraud and held that Santos' holding would apply in non-gambling cases only if the underlying SUA created the same risk of merger as the illegal gambling statute.  Halstead, 634 F.3d at 279.  Applying this reasoning to Halstead, the Fourth Circuit held that "regardless of whether 'proceeds' is defined as 'gross receipts' or 'net profits,' a merger problem does not occur, because [the defendant]'s commission of healthcare fraud was complete before he committed money laundering."  Halstead, 634 F.3d at 271-72.

Here, as in Halstead, there was no threat of merger because the mail, wire, or securities frauds (the underlying SUAs) were complete the moment Petitioner, his father, or his brother obtained money from any of the investors by virtue of their materially false and fraudulent representations about their various companies.  Accordingly, there is no risk of merger and the "net profits" definition of proceeds set forth in Santos does not apply.  The fraud was already complete by the time Petitioner, for instance, spent the investor money to purchase guns, jewelry, official checks, electronic equipment, dinner at Morton's, or make payments on luxury cars.  Because these transactions occurred subsequent to a completed stage of the original Ponzi scheme, merger is not an issue and Santos does not apply.[13]

Second, Petitioner's Santos argument fails because the money laundering conspiracy to which he pled guilty also involved transactional and concealment money laundering, scenarios

_____

[13]  The Government states that it could have proved that at least one of these transactions involved net profits of the scheme.  With the exception of KB Records, none of the companies had any operational capacity, so there were no expenses.  There were only net profits.  The Government asserts that this was especially true for the purported gold mine—which did not even exist.  Therefore, any of the personal expenditures from the Dimmette/Holland DiBruno Brothers Mining investment could have qualified as a "net profit."

not covered by <u>Santos</u>.  The Government states, for instance, that it could have proved transactional money laundering by showing that Petitioner made a $19,000 down payment on a Hummer H2 or a $30,000 counter-withdrawal from the International Senatorial Committee bank account.  The conspiracy also involved concealment money laundering, which the Government states that it could have proven by showing, for instance, that Petitioner deposited investor Kenny Aronoff's investment in a food supplement company into the KB Records Account, any number of the cash withdrawals Petitioner made, or the transactions where he asked his girlfriend, aunt, and mother to cash out Christine Bean's $65,000 foreign currency exchange investment into official checks so the money could not be traced.

Third, <u>Santos</u> was decided June 2, 2008, several months after Petitioner entered his plea of guilty to conspiracy to commit money laundering.  Counsels' failure to predict that change does not mean they were ineffective within the meaning of the Sixth Amendment.  <u>See</u> <u>United States v. Harms</u>, 371 F.3d 1208, 1212 (10th Cir. 2004) ("The Sixth Amendment does not require counsel for a criminal defendant to be clairvoyant.").  This is so even if a subsequent change to the law could lead to a reduction in the defendant's sentence.  <u>See</u> <u>Valenzuela v. United States</u>, 261 F.3d 694 (7th Cir. 2001) (holding that defense counsel was not ineffective for failing to predict the Supreme Court's decision in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000)).

In sum, for the reasons stated herein, Petitioner cannot show that his attorneys' performances were deficient as to his <u>Santos</u> claim.


**6. Counsel Brown's Filing of the Motion to Withdraw Guilty Plea (Issue 5) and Preparation for Sentencing Hearing (Issue 11)**

Petitioner next contends that his third court-appointed attorney, Attorney Brown, was ineffective for filing the motion to withdraw Petitioner's guilty plea, "which Petitioner was completely unaware of," and for failing to adequately prepare for the sentencing hearing.[14] (Doc. No. 1-1 at 22). Both claims are denied, as Petitioner did not suffer any prejudice, nor can he show Brown was deficient in his representation at the sentencing hearing.

First, with regard to the written motion to withdraw guilty plea claim, Petitioner cannot show prejudice. Even assuming that Petitioner did not want the written motion filed, he explicitly told the Court at the beginning of the hearing on September 22, 2008, that he wanted to proceed on the motion to withdraw his guilty plea, but on a different basis than what was alleged in the written motion. The Court told Petitioner that he could proceed on any basis and would not be limited to the arguments made in the written motion. Petitioner affirmed his desire to move forward on the motion to withdraw, then proceeded to take part in his father's charade that their guilty pleas were the result of coercion. Petitioner even testified that he, his father, and his brother were innocent of the charges to which they had all pled guilty. The Court found that this conduct—Petitioner's statement in court that he wanted to proceed on the motion to withdraw and testifying falsely as to his innocence—breached the plea agreement and allowed the Government to withdraw from its earlier agreement to recommend the low end of the guideline range. Thus, it was Petitioner's own conduct, not his attorney's, which allowed the Government to request a higher sentence. Petitioner has not shown that Attorney Brown's filing of the written motion prejudiced him in any way.[15]

---

[14] In his affidavit, Attorney Brown stated that Petitioner was aware that Attorney Brown was preparing such a motion on his behalf. (Doc. No. 9-2 at 2).

[15] Furthermore, Petitioner has not shown that the Court would not have imposed this same sentence, even if the Government was limited to recommending the low end.

Next, as to the supposed lack of preparation at sentencing, this claim is contradicted by the record of the sentencing hearing, which shows that Attorney Brown capably and effectively represented Petitioner's interests at sentencing. To the extent this claim has to do with Attorney Brown's failure to have a witness present at the sentencing hearing to refute a victim's testimony that the financial loss caused by the DiBrunos led to her husband's suicide, Petitioner was given the opportunity to testify through hearsay as to what this supposed witness would have testified. To the extent this claim accuses Attorney Brown of not "interview[ing] Government witnesses who were involved in an effort to obtain Petitioner's business . . . that would have impeached and discredited Government witness's testimony against Petitioner," Petitioner fails to explain how these witnesses had anything to do with the sentence he ultimately received. <u>See</u> (Doc. No. 1-1 at 44). As the Government notes, these supposed witnesses would appear to have more relevance to the merits of the case, which Petitioner decided not to contest by virtue of his guilty plea.

In sum, for the reasons stated herein, Petitioner has not shown that Attorney Brown was ineffective for filing the motion to withdraw Petitioner's guilty plea and for failing to adequately prepare for the sentencing hearing.

## IV. CONCLUSION

For the reasons stated herein, the Court will dismiss the § 2255 petition and grant Respondent's motion for summary judgment.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's § 2255 motion to vacate, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2.     The Government's Motion for Summary Judgment, (Doc. No. 10), is

       **GRANTED**.

3.     Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court

       declines to issue a certificate of appealability as Petitioner has not made a

       substantial showing of the denial of a constitutional right.  28 U.S.C. §

       2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to

       satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find

       the district court's assessment of the constitutional claims debatable or wrong).

Signed: September 15, 2014

Frank D. Whitney
Chief United States District Judge